**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROSSIDOC LLC, d/b/a The Irish Nobleman,    )
an Illinois limited liability company; and    )
ARMITAGE BARS, INC., d/b/a Chicago    )
Bar Shop,    )
    )
        Plaintiffs,    )
    )    No. 23 C 13410
    v.    )
    )    Judge Sara L. Ellis
THE CITY OF CHICAGO, a municipal    )
Corporation, and DANIEL LA SPATA,    )
an individual,    )
    )
        Defendants.    )

## OPINION AND ORDER

Defendant Daniel La Spata, the Alderman for the City of Chicago's 1st Ward, exercised his aldermanic prerogative to deny Plaintiff Rossidoc LLC's, d/b/a The Irish Nobleman ("The Irish Nobleman"), application for an extended outdoor dining area in 2023. The Irish Nobleman and its sister company, Plaintiff Armitage Bars, Inc., d/b/a Chicago Bar Shop (the "Bar Shop"), contend that La Spata did so because of Plaintiffs' criticisms of him and their support for his political opponents. After La Spata denied the permit, Plaintiffs filed this lawsuit against him and Defendant City of Chicago, alleging that Defendants violated their equal protection and due process rights under the Fourteenth Amendment and retaliated against them in violation of their First Amendment rights. Defendants filed a motion to dismiss the first amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). While Plaintiffs' claims are ripe for review and a basis exists to hold the City liable, the Court agrees with Defendants that the Bar Shop has not alleged a violation of its rights so as to continue as a Plaintiff in this case. As

for The Irish Nobleman, it has sufficiently alleged a First Amendment retaliation claim but cannot proceed with its equal protection or due process claims.

**BACKGROUND**[1]

## I.      Aldermanic Prerogative

In the City, aldermanic prerogative refers to an alderperson's ability to initiate or block City Council or other government action concerning their own ward.  The prerogative is unwritten, exercised at the alderperson's discretion.  In the context of a 2019-2023 U.S. Department of Housing and Urban Development ("HUD") investigation into affordable housing practices in the City, alderpersons defended the prerogative as being "necessary to ensure that local concerns are considered in development decisions."  *Id.* ¶ 19.  HUD's investigation, however, indicated that the "Council routinely shows unquestioning deference to local aldermen even in the absence of any articulated local concern, and even where concerns are clearly invoked as pretext to block integrative affordable housing."  *Id.*  Former City Mayor Lori Lightfoot attempted to end the prerogative, noting that the practice "breeds corruption" and was not "in the city's interest."  Doc. 15 ¶ 12.  But only once during Mayor Lightfoot's tenure did the City Council vote to defy the prerogative.

## II.      The City's Expanded Outdoor Dining Program

In response to the COVID-19 pandemic's limitations on indoor dining, in the summer of 2020, the City launched a pilot expanded outdoor dining ("EOD") program, which initially closed six streets off to traffic around the City, allowing local restaurants to expand their operations by offering socially distanced outdoor seating options.  In 2021, the City extended the EOD program and, in 2023, made it a permanent feature.  Those restaurants and bars interested

---

[1] The Court takes the facts in the background section from Plaintiffs' first amended complaint and the exhibit attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

2

in obtaining an EOD permit must apply annually, with an issued permit valid from May 1 to October 31 of the year of issuance. An applicant submits the application to the Commissioner of Transportation, after which the Commissioner reviews the application for compliance with the EOD ordinance rules. The EOD ordinance provides the following procedure if the Commissioner concludes that the application is complete:

> [T]he Commissioner shall provide the application to the alderman of the affected ward. The alderman shall provide a recommendation to the Commissioner regarding the application within 30 days of receiving it, unless, the Commissioner determines that good cause exists for a reasonable extension, not to exceed 30 days. The recommendation regarding the application shall be based upon the alderman's analysis of the requirements of this article and the rules promulgated in furtherance of the article. Such recommendation shall not be unreasonably withheld. The Commissioner shall issue the Outdoor Dining Street Permit to the applicant if the Commissioner finds that the applicant meets the applicable requirements and the alderman's recommendation is that the permit application should be approved. If the Commissioner finds that the applicant meets the applicable requirements, but the alderman recommends that the permit application should be denied, the applicant, with the assistance of the Department of Transportation ["CDOT"], may submit for City Council consideration an applicant-sponsored ordinance granting approval of an Outdoor Dining Street Permit.

MCC § 10-28-593(b).

### III.    Plaintiffs' Businesses

The Irish Nobleman operates a bar and restaurant of the same name at 1367 W. Erie Street, located in the City's 1st Ward, which La Spata represents. The Irish Nobleman's principal, who lives in the 1st Ward, also owns and runs the Bar Shop, which provides bars and restaurants with interior design and operational services. The Bar Shop also helps its clients comply with state and local requirements. At some point, Plaintiffs' principal explained the Bar Shop's functions and operations to La Spata.

3

The Irish Nobleman has a retail food establishment license and a tavern license, which allow it to serve food and alcohol on its premises.  In addition to its interior space, the Irish Nobleman has a patio and sidewalk café.  The City's requirements for a sidewalk café permit include that the café be located only on the sidewalk, have a boundary fully enclosing the permitted area that separates it from the remainder of the public way, and have a six-foot clearance for pedestrians along the sidewalk.  The Irish Nobleman obtained a sidewalk café permit in 2020 and has operated the sidewalk café in compliance with City requirements and without any violations or infractions.

The COVID-19 pandemic significantly hindered The Irish Nobleman's business operations.  To maintain its business during the initial closures, it converted its dining room into a walk-up ice cream and concession stand window.  This, however, angered La Spata, who came into The Irish Nobleman in the summer of 2020 asking staff something along the lines of "who said you could open an ice cream shop in my ward?"  *Id.* ¶¶ 39–40.  Despite The Irish Nobleman's principal informing La Spata that its retail food establishment license covered and allowed for the sale of ice cream, La Spata continued to ask how The Irish Nobleman sold ice cream and who allowed it.  This turned out to be The Irish Nobleman's first, but not last, encounter with La Spata.

In addition to having to adapt to the COVID-19 pandemic, The Irish Nobleman saw increased crime in its surrounding area over the summer of 2020.  In response, Plaintiffs' principal reached out to La Spata's ward office to inquire about placing speed bumps around the bar because drag racing had become prevalent on the surrounding streets.  At the suggestion of La Spata's office, Plaintiffs began gathering signatures to support such an initiative, ultimately presenting La Spata with a petition with roughly 1,000 signatures.  But La Spata refused to

accept the petition because it was "not on [his] letterhead forms." *Id.* ¶ 48. Plaintiffs' principal also made claims on social media about the high level of crime in the neighborhood during La Spata's brief tenure. An October 2020 Block Club Chicago article quoted Plaintiffs' representatives about crime in the neighborhood, the need for speed bumps, and their desire to see the City address their safety complaints.

Following these criticisms, La Spata's office began contacting Plaintiffs' principal almost weekly, complaining that The Irish Nobleman's customers were excessively loud during televised sporting events and that its neighbors had complained and were "irate." *Id.* ¶ 51. Plaintiffs' principal agreed to meet with the neighbors, but La Spata's office did not provide their identities or coordinate a meeting, leading Plaintiffs to believe that La Spata fabricated the complaints to silence Plaintiffs' principal about the increased crime in the area.

In addition, The Irish Nobleman found itself the subject of increased inspections, with one City inspector remarking that he had "never seen so many inspections on a single restaurant in such a short period of time." *Id.* ¶ 55. Multiple inspectors indicated that they conducted the inspections at La Spata's office's behest. In the summer of 2021, over twenty-seven unscheduled inspections took place at The Irish Nobleman. These inspections often caused The Irish Nobleman's operations to come to a halt until the inspections concluded.

## IV. Plaintiffs' Principal's Support for La Spata's Political Opponents

In addition to his outspokenness about crime in the 1st Ward, Plaintiffs' principal publicly supported La Spata's political opponents. Beginning in 2022, Plaintiffs' principal openly supported two candidates running against La Spata in the City's February 1, 2023 election by hosting fundraisers at The Irish Nobleman and allowing opposing candidates to leave campaign signs there. Plaintiffs' principal informed La Spata of his support for the other

candidates at some point in 2022 but also offered La Spata the opportunity to post signs and hold fundraisers at The Irish Nobleman.

In July or August 2022, The Irish Nobleman announced on social media and in community groups and forums to which La Spata belonged that it would host a fundraiser for one of La Spata's opponents. Approximately thirty minutes after the announcement, La Spata came to The Irish Nobleman demanding the removal of the sidewalk café, claiming the bar did not have a valid permit for it. La Spata refused to acknowledge the valid café permit posted at the bar's entrance. The Irish Nobleman went on to host approximately six events for alternate aldermanic candidates, posting about them on social media.

After The Irish Nobleman hosted some of these fundraisers, the City ordered it to remove certain inflatable decorations it had put up outside the bar in December 2022. Plaintiffs' principal told reporters that he believed that La Spata tipped off inspectors about the decorations for political reasons, in retaliation for The Irish Nobleman holding fundraisers for La Spata's opponents. On May 17, 2023, The Irish Nobleman's representative provided an interview to Fox News in which he stated that the City told businesses to "police themselves," that doing business with the City "makes [him] want to leave," and that the City threatened to fine The Irish Nobleman $1,000 per day if it operated its patio. *Id.* ¶ 136.

## V.     The Irish Nobleman's EOD Applications

The Irish Nobleman obtained an EOD permit for the 2020, 2021, and 2022 outdoor dining seasons. The Irish Nobleman used the curb lane and diagonal parking area in front of its property to operate the patio. Its EOD permit allowed for forty to fifty outdoor seats, depending on the COVID-19 restrictions in place at the time. In 2021, in exchange for the EOD permit, La Spata required The Irish Nobleman to remove its sidewalk café. He did not require other bars

and restaurants in the 1st Ward to choose between one or the other, however. In 2022, La Spata initially denied The Irish Nobleman's EOD permit, indicating that it had to reduce the total number of tables to four, another demand that he did not impose on other bars or restaurants in the 1st Ward. The Irish Nobleman then worked directly with the City's Business Affairs and Consumer Protection Department to resume its sidewalk café operations given the EOD permit's capacity reduction.

On June 1, 2023, The Irish Nobleman applied for a 2023 EOD permit. Its EOD application and seating plans were substantially similar, if not identical, to the prior years' applications. In light of the prior two years' experiences, Plaintiffs' principal preemptively reached out to La Spata's office to address any changes to the application that La Spata might request. On June 7, 2023, La Spata's office demanded that the Irish Nobleman immediately remove its sidewalk café due to the alleged lack of a permit. The Irish Nobleman had posted its valid café permit at the entrance to the bar, a fact that Plaintiffs' principal brought to La Spata's office's attention. The office responded that it could not locate the sidewalk café permit on the City portal. La Spata then continued to insist that in order for The Irish Nobleman to obtain an EOD permit for 2023, it would have to abandon its sidewalk café and reduce the total amount of outdoor seating, citing a non-existent citation concerning the sidewalk café permit.

In July 2023, an after-hours shooting occurred just outside of The Irish Nobleman that did not involve any of The Irish Nobleman's representatives or patrons. On July 13, 2023, La Spata held a meeting with neighborhood residents and business owners ostensibly to discuss crime in the area. At the meeting, La Spata acknowledged that The Irish Nobleman had a valid sidewalk café permit but indicated he was denying its EOD application because The Irish Nobleman had two extra tables and four extra chairs on the sidewalk. He also stated that even if

he wanted to approve the EOD permit, the permit system would not let him do so.  La Spata did not address neighborhood safety issues at the meeting.  Plaintiffs' representatives and community members expressed their disagreement with La Spata's decision to deny The Irish Nobleman's EOD application, contending that an increased patio presence deterred crime and that the patio allowed staff to earn increased wages to make up for slower months.  La Spata indicated he would reevaluate The Irish Nobleman's application in thirty to sixty days, with the delay reducing the possibility that The Irish Nobleman could take advantage of the 2023 EOD season.

On July 17, 2023, Plaintiffs' representative contacted La Spata's office seeking further information about the permit denial, highlighting that the bar had complied with occupancy requirements at all times.  La Spata's office responded two days later, stating that "[s]ince your business threatened to sue the City at our last meeting, we have no follow-up comment."  *Id.* ¶ 119.  The email also included a copy of the outdoor dining ordinance and instructed Plaintiffs to direct any further questions to the City's Law Department.

Following the EOD ordinance's direction, on July 26, 2023, The Irish Nobleman requested CDOT's assistance in seeking approval from the City Council of the EOD permit, following up again with CDOT on August 3, 2023.  CDOT did not respond or otherwise assist The Irish Nobleman in filing an applicant-sponsored ordinance.

Because it did not receive an EOD permit in 2023, The Irish Nobleman had less outdoor seating in 2023 than it had before the COVID-19 pandemic.  The Irish Nobleman was the only business in the 1st Ward that had an EOD permit or renewal application denied by La Spata.  In addition to causing a revenue decrease for The Irish Nobleman, Plaintiffs' principal informed La Spata that his denial of the EOD permit also harmed the Bar Shop because it created the

8

perception that the Bar Shop had failed to design a bar that complies with all state and local laws. Other potential Bar Shop clients have also told Plaintiffs' principal that they do not want to associate with the Bar Shop out of fear of retribution from La Spata and the City.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). If, as here, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly-Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

9

**ANALYSIS**

**I.      Ripeness**

Defendants first argue that Plaintiffs' claims are not ripe for review.  For a claim to be ripe, it cannot be "premised on uncertain or contingent events."  *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676 (7th Cir. 2019); *see Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) ("Ripeness doctrine is based on the 'central perception . . . that courts should not render decisions absent a genuine need to resolve a real dispute.'" (alteration in original) (citation omitted)).  In evaluating a claim for ripeness, courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021) (citation omitted).  "Plain and simple, ripeness is 'peculiarly a question of timing.'"  *Id.* (citation omitted).

Because Plaintiffs challenge a land use determination, Defendants contend that they first had to obtain a final decision from the City Council concerning their 2023 EOD application before coming to court.  "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."  *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019).  The "finality requirement is relatively modest," however, with a plaintiff only having to show that "no question [exists] about how the regulations at issue apply to the particular land in question."  *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 478 (2021) (citation omitted) (internal quotation marks omitted).  And while "a plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain for the

government to clarify or change its decision," a claim meets the ripeness requirement if the government "has adopted its final position" despite a plaintiff's "administrative missteps." *Id.* Beyond pure takings claims, the Seventh Circuit has extended the *Williamson County* finality requirement to equal protection, First Amendment retaliation, and due process claims arising out of land use determinations. *See Flying J v. City of New Haven*, 549 F.3d 538, 543 (7th Cir. 2008) (*Williamson County* finality requirement applies not only to takings claims but also to equal protection and due process claims alleging government interference with use of real property); *Strauss v. City of Chicago*, 346 F. Supp. 3d 1193, 1203 (N.D. Ill. 2018) ("[The *Williamson County*] prerequisites apply not only to takings claims, but also to any other constitutional claim requiring analysis of the scope of an economic injury arising from governmental interference with the value of physical property.").

Initially, the Court questions whether *Williamson County*'s finality requirement applies in this case, where Plaintiffs presumably do not own the land on which they wanted to place the patio and so cannot claim to have suffered an interference with the value of their property. *See Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 421 (7th Cir. 2010) ("In order to qualify as a regulatory taking, the measure must place such onerous restrictions on land as to render it useless."); *Oxford Bank & Tr. v. Vill. of La Grange*, 879 F. Supp. 2d 954, 962–63 (N.D. Ill. 2012) (rejecting application of the *Williamson County* requirements where "the alleged economic effects [were] a far cry from the denial of all economically beneficial or productive use of the land" (quoting *Muscarello*, 610 F.3d at 421)). But even assuming that the finality requirement applies, that requirement includes a futility exception. "[A] demonstration of futility may allow a plaintiff to bypass the typical showing required for finality, *i.e.*, exhausting all avenues for reconsideration or alternative means of approval." *King Sykes LLC v. City of*

*Chicago*, No. 23-CV-1636, 2024 WL 730375, at *5 (N.D. Ill. Feb. 22, 2024). Generally, futility requires a plaintiff to have made "at least one meaningful application." *Unity Ventures v. Cnty. of Lake*, 841 F.2d 770, 775 (7th Cir. 1988) (quoting *Herrington v. Cnty. of Sonoma*, 834 F.2d 1488, 1495 (9th Cir. 1987)).

Plaintiffs have sufficiently alleged that the City's position on The Irish Nobleman's petition was sufficiently final to excuse The Irish Nobleman's failure to introduce an applicant-sponsored ordinance to the City Council. The Irish Nobleman submitted its EOD renewal application on June 1, 2023. According to a CDOT assistant commissioner, the only hold up with the application was La Spata, who, at a July 13, 2023 meeting with neighborhood residents, announced that he was denying the application but would reevaluate it in thirty to sixty days. By doing so, La Spata essentially ran out the clock on The Irish Nobleman's application, knowing the City Council's deference to aldermanic prerogative and the need to obtain a new EOD permit each year. And while Plaintiffs sought assistance from CDOT to seek approval from the City Council, CDOT did not respond. Even if it had, Plaintiffs allege that aldermanic prerogative effectively guaranteed the City Council would not override La Spata's denial. These allegations about Plaintiffs' submission of the application, La Spata's rejection, CDOT's refusal to help them reach the City Council, aldermanic prerogative, and the limited season for an EOD permit suffice to suggest that the City effectively reached a conclusive determination on The Irish Nobleman's application, making further pursuit of the application through an applicant-sponsored ordinance before the City Council futile.[2] *See King Sykes*, 2024 WL 730375, at *6–7

---

[2] The Court does not find that *Unity Ventures* compels a different result. In that case, plaintiffs had not sought formal approval of their request for a sewer connection, and the mayor had only informally refused to approve the connection "at that time." 841 F.2d at 776. Although the *Unity Ventures* court found plaintiffs' claims not ripe for adjudication, this appears to have been largely due to the failure to submit a formal application and pursue other avenues of relief. *See id.* ("We will not evaluate the adequacy of the procedures available to the plaintiffs before they have availed themselves of those

(finding claim ripe where the plaintiff made pre-application proposals that the alderwoman rejected and it was clear that the City had committed to that position); *cf. Akmakjian v. Vill. of Hoffman Ests.*, No. 22 C 04023, 2023 WL 2242006, at *2–3 (N.D. Ill. Feb. 27, 2023) (finding claim unripe where the plaintiff only obtained a courtesy review from the village planning and zoning committee and did not submit a formal request for the village board's consideration).

Even if the futility exception did not apply, the Seventh Circuit has recognized another exception to the *Williamson County* finality requirement for "*bona fide* equal protection claims," which arise, at least in part, from the alleged "malicious conduct of a government agent, in other words, conduct that evidences a spiteful effort to get [the plaintiff] for reasons unrelated to any legitimate state objective." *Flying J*, 549 F.3d at 543 (quoting *Forseth v. Vill. of Sussex*, 199 F.3d 363, 371 (7th Cir. 2000)). Here, Plaintiffs' claims also fall within this exception, as Plaintiffs allege that La Spata targeted them not for any legitimate reason but instead out of spite and in retaliation for their support of his political opponents. *See Strauss*, 346 F. Supp. 3d at 1204 (equal protection, First Amendment, and substantive due process claims "focuse[d] on allegations of disparate treatment, irrationality, and/or improper retaliatory motivation" and so avoided *Williamson County*'s ripeness requirement); *Oxford Bank & Tr.*, 879 F. Supp. 2d at 963 (equal protection and substantive due process claims did not need to meet *Williamson County*'s ripeness requirement because the plaintiffs alleged "animus, ill-will, and spiteful conduct"). Therefore, ripeness does not pose a bar to Plaintiffs' claims, and the Court proceeds to address Defendants' remaining challenges to the first amended complaint.

---

procedures."). Here, The Irish Nobleman submitted a formal application, and Plaintiffs allege that La Spata's indication that he would review the request again at a later date was nothing more than bluster, intended to run out the clock on the 2023 EOD permit season. At this point, with the 2024 EOD season already underway, no "avenues still remain for the government to clarify or change its decision" with respect to the 2023 EOD application. *Pakdel*, 594 U.S. at 480.

II.    **Basis for *Monell* Liability**

Turning to Defendants' Rule 12(b)(6) challenges, the City first argues that Plaintiffs have not sufficiently alleged a basis to hold it liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).  Although Plaintiffs cannot hold the City liable under § 1983 based on *respondeat superior*, *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015), pursuant to *Monell*, Plaintiffs can sue the City under § 1983 if the City's policy or practice was the "moving force of the constitutional violation." *Monell*, 436 U.S. at 694.  To state a *Monell* claim, Plaintiffs must allege (1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

Plaintiffs allege that aldermanic prerogative constitutes a widespread custom and practice and that La Spata had final policymaking authority.  With respect to a custom or practice, Plaintiffs contend that aldermanic prerogative is a well-recognized though unwritten practice in the City that effectively gives alderpersons veto power over decisions affecting their respective wards.  The City responds that Plaintiffs' allegations do not suffice to show that aldermanic prerogative constitutes a widespread practice and that, even if it did, Plaintiffs cannot allege that aldermanic prerogative served as the "moving force" behind the alleged constitutional violations. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (policy or practice "must be the direct cause or moving force behind the constitutional violation" (citation omitted) (internal quotation marks omitted)).  While Plaintiffs have not presented another example of an EOD permit being denied because of aldermanic prerogative, they have

sufficiently alleged that aldermanic prerogative amounts to a widespread practice in the City Council based on: (1) The Irish Nobleman's experience; (2) HUD's conclusions about the prerogative's existence and its effect on affordable housing; (3) a prior instance of aldermanic prerogative blocking a sidewalk café permit, albeit under a slightly different ordinance; (4) former Mayor Lightfoot's attempts to end the prerogative; and (5) the City Council's continued adherence to the prerogative in all but one instance during her term.  This suffices to allege that aldermanic prerogative amounts to a widespread practice in the City.  *See 520 S. Mich. Ave. Assocs., Ltd. v. Fioretti*, No. 07C4245, 2008 WL 4831730, at *6 (N.D. Ill. Nov. 5, 2008) (allegations that City's customary practice was that the departments with final authority regarding permit approval "withhold approval of any permit absent the affected alderman's support" sufficed to allege a widespread custom).  Additionally, at this stage, Plaintiffs have sufficiently suggested that La Spata's exercise of aldermanic prerogative, and the City Council's deference to it, acted as the moving force behind their injury based on their claim that The Irish Nobleman would have obtained the EOD permit absent La Spata's exercise of aldermanic prerogative.  While Defendants use Plaintiffs' allegations that everyone but La Spata approved of the permit's issuance to argue that Plaintiffs should have pursued an applicant-sponsored ordinance, the Court cannot resolve such factual questions at the pleading stage.  At this point, Plaintiffs have sufficiently suggested the futility of such an attempt, allowing the inference that the prerogative acted as the moving force behind their injury.

As for whether La Spata qualifies as a final policymaker, the City argues that La Spata did not have the authority to set the policy regarding EOD permits, with the EOD ordinance making clear that the City Council has final authority as to EOD permit requests.  *See Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 739 (7th Cir. 1999) (distinguishing between the "delegation of

authority to set policy for hiring and firing" versus the "delegation of only the final authority to hire and fire"). But at this stage, the Court finds that Plaintiffs have sufficiently pleaded that La Spata had final policymaking authority with respect to applications for EOD permits in the 1st Ward.

In determining whether La Spata has final policymaking authority over this question, the Court considers not only municipal law, but also "custom or usage having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citation omitted) (quotation marks omitted). The EOD ordinance indicates that an alderman makes only a recommendation regarding an EOD application and shall not "unreasonably with[o]ld" a positive recommendation. MCC § 10-28-593(b). It also provides that an applicant can submit an applicant-sponsored ordinance to the City Council for approval of an application if the alderperson recommends denial of the permit application. *Id.* The City argues that this shows that the City Council, and not La Spata, had final authority on EOD permits. But Plaintiffs allege that the City's unwritten practice of aldermanic prerogative essentially amounts to each alderperson having a veto over issues affecting permits in their respective ward. At this stage, these allegations suggest that the City Council delegated to each alderperson the authority to make policy decisions concerning EOD applications in their respective wards. *See Kujawski*, 183 F.3d at 739 (question of fact existed as to whether the board of commissioners had delegated final policymaking authority to an official with respect to the corrections department as a matter of custom, where the board did not review personnel decisions or otherwise intervene in issues involving corrections department employees); *520 S. Michigan Ave. Assocs., Ltd. v. Fioretti*, No. 07 C 4245, 2009 WL 3151794, at *2, 10 (N.D. Ill. Sept. 28, 2009) (evidence showed that the City Council had delegated final authority over sidewalk café permit applications to

16

alderpersons, with the City Council just a rubberstamp on the alderpersons' decisions). Thus, because Plaintiffs have sufficiently alleged a basis for *Monell* liability, the Court will not dismiss the City from this case.

### III. The Bar Shop's Interest in this Case

Next, Defendants argue that the Bar Shop has not pleaded any basis for finding that Defendants' actions violated the Bar Shop's rights. The Court agrees with Defendants that the Bar Shop has not alleged a basis to find that it is a proper plaintiff. While Plaintiffs share the same principal, all of the allegedly unconstitutional conduct arises from The Irish Nobleman's EOD application. While La Spata's actions may have had some trickle-down effect on the Bar Shop's business given its shared ownership with The Irish Nobleman, the Bar Shop has not sufficiently alleged that Defendants deprived it of a constitutional right. *See Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006) ("A cause of action under § 1983 requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a person acting under color of law."). Therefore, the Court dismisses the Bar Shop as a plaintiff in this case.

### IV. Equal Protection Claim

Defendants also argue that The Irish Nobleman cannot proceed on its equal protection class-of-one claim. To adequately plead a class-of-one equal protection claim, The Irish Nobleman must "allege facts plausibly suggesting that [it] was 'intentionally treated differently from others similarly situated' and 'there is no rational basis for the difference in treatment.'"[3]

---

[3] The Seventh Circuit has left unsettled whether a plaintiff also must plead "animus, malice, or some other improper motivation" to sufficiently allege a class-of-one equal protection claim. *Frederickson v. Landeros*, 943 F.3d 1054, 1061 (7th Cir. 2019) ("[W]e have not definitively resolved the question whether it is sufficient for a plaintiff simply to allege differential treatment at the hands of the police with no rational basis, or if a class-of-one claim requires a plaintiff *additionally* to prove that the police acted

*Van Dyke v. Vill. of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020) (citation omitted). The Irish Nobleman alleges that La Spata denied its EOD application and singled it out for irrational and politically motivated reasons. Defendants argue, however, that no clear standard exists for the Court to evaluate La Spata's failure to approve the EOD application because of the discretionary nature of the decision. They also contend that the claim fails because rational bases exist for the EOD permit denial.

The Court need only address the latter argument. While The Irish Nobleman contends that La Spata acted vindictively because its principal supported opposing aldermanic candidates in the most recent election, its claim cannot survive merely by alleging an improper motive. *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015). At the pleading stage, "[a]ll it takes to defeat [a class-of-one] claim is a *conceivable* rational basis for the difference in treatment," and plaintiffs may "plead themselves out of court if their complaint reveals a potential rational basis for the actions." *Id.* at 1121 (alterations in original) (citation omitted).

The Irish Nobleman alleges that its EOD patio used the curb lane and diagonal parking area in front of its property. It also alleges that La Spata had raised concerns about noise and congestion in the neighborhood surrounding The Irish Nobleman and had stated that he denied the 2023 EOD application because The Irish Nobleman's café had extra tables and chairs. In line with these concerns, The Irish Nobleman acknowledges that La Spata required revisions to prior permit applications to reduce the total amount of outdoor seating. The first amended complaint thus reveals a potential rational basis for La Spata's refusal to approve The Irish Nobleman's 2023 EOD application, namely concerns with noise and congestion arising from the increased outdoor dining presence. *See Vision Church v. Vill. of Long Grove*, 468 F.3d 975,

---

for reasons of personal animus, malice, or some other improper personal motivation."). The Court need not resolve this question in deciding the sufficiency of The Irish Nobleman's claim.

1001 (7th Cir. 2006) (noting that restaurant patios "raise unique concerns such as traffic control [and] noise pollution," which could justify differential treatment); *Cohen v. City of Des Plaines*, 8 F.3d 484, 494 (7th Cir. 1993) ("A city may use zoning regulations as an exercise of the police power to protect residents from the ill effects of urbanization, such as crowding, encroachment of commercial businesses or industries, traffic congestion, and noise."); *see also Chi. Studio Rental v. Ill. Dep't of Com.*, 940 F.3d 971, 980 (7th Cir. 2019) (a rational basis exists so long as the Court identifies "a conceivable rational basis for the different treatment," even if it is not "the actual basis for [the] defendant's actions"); *Miller*, 784 F.3d at 1121 ("[A] class-of-one plaintiff must, to prevail [on a motion to dismiss], negative [in her complaint] any reasonably conceivable state of facts that could provide a rational basis for the classification." (citation omitted)).

Therefore, even if some animus toward The Irish Nobleman and its principal motivated La Spata in part, The Irish Nobleman's claim still fails because La Spata's decision has a rational basis. *See Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014) ("If we can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no."); *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) ("[A] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity."); *Flying J*, 549 F.3d at 547 ("It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play."). Therefore, because the first amended complaint reveals a potential rational basis for La Spata's refusal to approve The Irish Nobleman's 2023 EOD application and The Irish Nobleman cannot plead around this, the Court dismisses the equal protection claim with prejudice. *See D.B.*, 725 F.3d at 686 (affirming dismissal of class-of-one claim where complaint revealed a rational basis).

19

## V.      First Amendment Retaliation

To prevail on its claim of political retaliation in violation of the First Amendment, The Irish Nobleman must allege that it "(1) engaged in activity protected by the First Amendment; (2) suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)). Defendants argue that The Irish Nobleman's allegations refute an inference of causation. Specifically, Defendants argue that The Irish Nobleman has alleged that La Spata's approach to the permit applications did not change, even after the alleged protected activity occurred, but that The Irish Nobleman's response did, with the bar refusing to make La Spata's requested changes in 2023 despite having done so in 2021 and 2022.

In arguing for dismissal based on a lack of causation, Defendants ask the Court to make factual determinations at the pleading stage. Causation "is generally 'a factual matter' that is 'best answered by the traditional finder of fact,' and not by a court at the pleading stage." *Carroll v. City of Oak Forest*, No. 19-cv-07412, 2020 WL 2526483, at *3 (N.D. Ill. May 18, 2020) (quoting *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013)). At this stage, The Irish Nobleman has sufficiently alleged that its very public support for La Spata's opponents in the 2023 aldermanic election prompted La Spata to deny its 2023 EOD application. *See id.* at *4 (allegations that the plaintiff campaigned against the mayor and then was barred from taking a firefighter exam sufficed to suggest that his First Amendment activity was a motivating factor in the decision to bar him from taking the exam). While the facts Defendants raise may ultimately undermine this showing and show that La Spata "would have reached the same result even

20

without the protected speech," that is a question for a later date.  *See McCarragher v. Ditton*, No. 14 C 08591, 2017 WL 2180436, at *7 (N.D. Ill. May 18, 2017) (at the pleading stage, a plaintiff need only allege that the protected activity was a "motivating factor, which means a sufficient, but not necessary, condition," and only later, after evidence is presented, must a plaintiff demonstrate that "but for his protected speech, the [defendant] would not have taken the adverse action" (citations omitted)).  Therefore, at this stage, The Irish Nobleman may proceed on its First Amendment Retaliation claim.

**VI.    Due Process**

Finally, the Court turns to The Irish Nobleman's due process claim.  The Irish Nobleman does not clarify whether it seeks to pursue a procedural or substantive due process violation, but either fails for the same reason: The Irish Nobleman has not shown that it had a constitutionally protected property interest in an EOD permit.

"[T]he threshold question in any due process challenge is whether a protected property or liberty interest exists."  *Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013); *Haney v. Winnebago Cnty. Bd.*, No. 3:19-cv-50191, 2020 WL 1288881, at *6 (N.D. Ill. Mar. 18, 2020) ("Both substantive and procedural due process claims require a plaintiff to identify a constitutionally protected right to property or liberty.").  "A protected property interest is a legitimate claim of entitlement—not defined by the Constitution—but 'by existing rules or understandings that stem from an independent source such as state law.'"  *Proctor v. McNeil*, 14 F. Supp. 3d 1108, 1112 (N.D. Ill. 2014) (citation omitted).  A protected liberty interest includes "bodily integrity, the right to marry, marital privacy, and the right to have children."  *Id.*

Here, The Irish Nobleman appears to assert a property interest in an EOD permit.[4]  "To maintain a claim of property over a government-issued benefit, such as a license or permit, a plaintiff must show that she has 'a legitimate claim of entitlement to it,' rather than 'a unilateral expectation to it.'"  *Dyson v. City of Calumet City*, 306 F. Supp. 3d 1028, 1041 (N.D. Ill. 2018) (citation omitted).  In other words, The Irish Nobleman only has a protected property interest in an EOD permit if the City's "discretion is clearly limited such that [The Irish Nobleman] cannot be denied the [permit] unless specific conditions are met."  *Id.* (quotation omitted)); *see also Lanna Overseas Shipping, Inc. v. City of Chicago*, No. 96 C 3373, 1997 WL 587662, at *8 (N.D. Ill. Sept. 18, 1997) ("[A] property right is only created if the municipality, under state law or ordinance, lacks discretion and must allow a grantee to retain the permit once the grantee has fulfilled the requirements.").  Here, the EOD ordinance states that the alderperson provides a recommendation regarding an EOD application "based upon the alderman's analysis of the requirements of this article and the rules promulgated in furtherance of the article" and that a "recommendation shall not be unreasonably withheld."  MCC § 10-28-593(b).  The Irish Nobleman seizes on the "shall not be unreasonably withheld" language to contend that the permit issuance is not discretionary but rather that The Irish Nobleman had an entitlement to the permit once it met specified criteria.  But the fact that an alderperson "shall not . . . unreasonably with[o]ld" approval does not remove discretion from the process and entitle The Irish Nobleman to an EOD permit.  Instead, the fact that the alderperson could recommend denial of the permit and so trigger the need for an applicant-sponsored ordinance for the City Council to consider whether to approve an EOD permit reinforces that The Irish Nobleman did not have a protected

---

[4] The Irish Nobleman cannot assert a property interest in the patio's land because the EOD patio would have been placed on the street, land that The Irish Nobleman does not own.  *Cf. Residences at Riverbend Condo. Ass'n v. City of Chicago*, 5 F. Supp. 3d 982, 986–88 (N.D. Ill. 2013) (noting that although "a property owner whose real property is subject to land use regulation has a protected property interest under the Fourteenth Amendment," adjacent property owners do not).

property interest in the issuance of an EOD permit. *See Navratil v. City of Racine*, --- F. 4th ----, 2024 WL 1979297, at *8 (7th Cir. 2024) (no protected property interest where nothing "guaranteed that a business meeting the [eligibility] criteria would receive funding"); *520 S. Michigan Ave. Assocs.*, 2008 WL 4831730, at *7–8 (no protected property interest in the issuance of a sidewalk café permit because the ordinances gave relevant department heads the discretion to approve, disapprove, and revoke the permits); *see also Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir. 1988) ("[A] merely subjective and unilateral expectancy is *not* protected by due process."). Thus, because The Irish Nobleman has not shown that it had a protected property interest in the issuance of an EOD permit, it has not adequately pleaded a due process claim. *See, e.g.*, *Henrichs v. Ill. L. Enf't Training & Standards Bd.*, 306 F. Supp. 3d 1049, 1058 (N.D. Ill. 2018) (no procedural due process claim pursuant to Rule 12(b)(6) where the plaintiffs had "no right to, and thus no property interest in, the concealed carry permits that they seek").

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [20]. The Court dismisses Armitage Bars, Inc., d/b/a Chicago Bar Shop, as a Plaintiff in this case. The Court dismisses the equal protection claim (Count I) with prejudice and the due process claim (Count III) without prejudice.

Dated: May 24, 2024

                                _____

                                SARA L. ELLIS
                                United States District Judge